UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| WALTER P. DRAKE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 3:09-0929 |
| v. | ) | (Crim. Case No. 3:05-00209) |
| | ) | Judge Echols |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM

Pending before the Court is Petitioner Walter P. Drake's "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by Person in Federal Custody" (Docket Entry No. 1). The Government has filed a response in opposition to that Motion. (Docket Entry No. 12).

### I. FACTUAL BACKGROUND

On March 2, 2005, Metro Park Police Officers Curtis Avant ("Officer Avant"), Richard Ellington ("Officer Ellington"), and others were assigned to provide security for a basketball game scheduled at the Cleveland Park Community Center ("Center") in Nashville, Tennessee, and to screen the spectators for illegal weapons and other contraband. Prior to that date, Metro Park Police had received numerous complaints about criminal activity at the Center.

To properly screen the spectators, officers decided to empty the Center and then allow the spectators to reenter the building after they had been "wanded" with a metal detection wand. A sign posted on the front door of the Center indicated that weapons were prohibited and that individuals desiring to enter the building would be subjected to security screening.

1

As Officer Avant entered the Center shortly before 7:00 p.m., he observed a large crowd of individuals at the back of the hallway. Officer Avant, who was in uniform, noticed that upon seeing him, Petitioner's eyes "got real big" and he took off running out the back door. Officer Avant pursued Petitioner through the back door and told Officer Ellington he had "one running." Officer Ellington circled around the building to the back of the Center.

Upon exiting the back door, Officer Avant saw the Petitioner standing on the back stoop with his body positioned in such a way that his left side and face were turned towards the officer. Petitioner was wearing a ski jacket and a black toboggan hat. Officer Avant noticed what appeared to be feathers floating out of the back of the coat. Officer Avant asked Petitioner what he was doing to which Petitioner responded something to the effect of "why are you messing with me?"

Within seconds of this encounter, Officer Ellington rounded the rear of the building and saw Officer Avant talking to Petitioner. Officer Ellington was able to see the Petitioner's right side, which Officer Avant could not see. As he approached, Officer Ellington focused on Petitioner's right hand which was cuffed around a pistol grip sticking out of the back of Petitioner's coat. At that point Ellington shouted "he's got a gun." Both officers then pulled their service revolvers and shouted to Petitioner to get on the ground. Petitioner ignored those directives, ran down a hill towards some railroad tracks, and jumped a fence into a wooded area.

Suspecting Petitioner may have been heading for the railroad tracks, Officer Ellington went looking for Petitioner in his squad car while Officer Avant pursued Petitioner on foot down the hill towards the railroad track. Officer Ellington radioed to other Park Police officers that Officer Avant was in pursuit of a subject with a gun who was heading towards the railroad tracks in the back of the Center.

2

Officer Avant testified at trial that while Petitioner was running away, he appeared to be trying to hide something. Officer Avant also testified that when Petitioner crossed the railroad tracks and went into the woods, Officer Avant heard rustling sounds and a clicking sound which suggested to him that someone might be trying to empty ammunition from a firearm.

Eventually, Petitioner was apprehended by other Park Police officers as he ran from the wooded area back onto the railroad tracks. After a brief struggle, Petitioner was placed in handcuffs. At the time, Petitioner did not have a firearm on him, nor was he wearing a black toboggan hat.

Petitioner was led back up a hill and placed in Officer Ellington's patrol car where he was read his Miranda rights by Officer Avant. Petitioner did not invoke his right to remain silent and did not ask for counsel. Instead, he stated that he had "been through it before" and had done time in jail.

Because Petitioner was not found to be in possession of a weapon, Officer Avant and other officers began to backtrack the route which had been taken by Petitioner. Petitioner remained in Officer Ellington's custody.

While sitting in Officer Ellington's vehicle, Officer Ellington asked Petitioner what he had done with the weapon, but Petitioner denied having a weapon. Petitioner stated that he was carrying a curtain rod which could be located by the fence. Officer Ellington radioed this information to Officer Avant. Officers subsequently found a shotgun with a pistol grip near the fence. The weapon was free of debris, suggesting that it had just been dropped there. A black toboggan hat was also located next to the shotgun and it, too, was free of debris.

Officer Avant secured the shotgun and it was eventually taken to the Nashville Police Department property and evidence room. Officers could not recall what was done with the hat, but surmised that it may have been given back to the Petitioner.

Petitioner was taken to the Criminal Justice Center ("CJC") for booking. Petitioner's hand was bleeding and the nurse on duty told the arresting officers that before Petitioner could be booked into the CJC he needed medical treatment. Petitioner was taken to Meharry Medical Center where he refused treatment. Petitioner was then returned to the CJC.

Two days later, on March 4, 2005, Petitioner was transferred to the custody of the Davidson County Sheriff's Office ("DCSO"). When Petitioner was taken into custody by the DCSO, a property report was prepared which indicated that Petitioner's property included a pair of socks, a pair of boxer shorts, three overcoats, a brown pair of pants, one white shirt and a pair of gym shoes. There is no mention of a black toboggan hat.[1]

While incarcerated at the DCSO, an inmate's personal property is bagged, sealed, and placed in a property room to which inmates have no access. Inmates are not allowed to receive clothing from outside sources while incarcerated.

On November 25, 2005, Petitioner was charged in this Court with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924. Petititoner was taken into federal custody by ATF agents that same day, transported to the federal courthouse in Nashville, and remanded to the custody of the United States Marshals Service. At the time Petitioner was taken into custody by the ATF agents, Petitioner was wearing a beige jogging suit and a black winter cap

---

[1] At trial, Donald Stacy, a claims investigator with the DCSO, testified that occasionally errors are made in the logging of property.

which had the logo "FDNY" on one side. Thinking the black hat may have been the same black hat Petitioner was wearing at the scene, agents seized the hat for evidence.

Prior to trial, Petitioner filed a Motion to Suppress the statements he made to Officer Ellington about the location of the curtain rod. He argued that he had not been read his Miranda rights and further that he had been illegally seized in violation of the Fourth Amendment. This Court rejected those arguments and denied the Motion to Suppress. After the denial of the Motion to Suppress, the Government filed a notice of enhanced punishment pursuant to the Armed Career Criminal Act, 18 U.S.C. § 924(e).

On June 15, 2006, following a three day trial,[2] the jury returned a verdict finding Petitioner guilty of being a convicted felon in possession of a firearm. Petitioner was sentenced to a term of imprisonment of 252 months to be followed by a supervised release term of five years. Petitioner's conviction was affirmed on appeal and his writ of certiorari was denied. United States v. Drake, 280 Fed. Appx. 460 (6th Cir. 2008), cert. denied, 129 S.Ct. 325 (2008). His present Section 2255 motion followed.

## II. STANDARD OF REVIEW

To prevail on a § 2255 motion, the Petitioner must establish either an error of constitutional magnitude that had a substantial and injurious effect or influence on his criminal proceeding, see Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993), or the record must reflect a fundamental defect in the proceedings that inherently resulted in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure. Reed v. Farley, 512 U.S. 339, 348

---

[2]Prior to trial, the parties stipulated that Petitioner had previously been convicted of a felony; that the shotgun found by the officers had traveled in interstate commerce; and that Petitioner had been in continuous custody since his arrest on March 2, 2005, until the date of trial.

5

(1994); United States v. Todaro, 982 F.2d 1025, 1028 (6th Cir. 1993). Claims of error must be raised in the trial court and on direct appeal or such claims are procedurally defaulted. See Phillip v. United States, 229 F.3d 550, 552 (6th Cir. 2000).

Under Rule 8 of the Rules Governing Section 2255 Proceedings, the Court "must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Petitioner is not entitled to an evidentiary hearing if the § 2255 motion and the record of the case conclusively show that he is not entitled to relief. See Green v. United States, 65 F.3d 546, 548 (6th Cir. 1995). Finally, when the trial judge also hears the collateral proceedings, the judge may rely on his recollections of the prior proceedings in ruling on the collateral attack. Blanton v. United States, 94 F.3d 227, 235 (6th Cir. 1996).

### III. ANALYSIS

Petitioner presents two grounds in his Motion, both of which allege that his counsel, Assistant Federal Public Defenders Mariah A. Wooten and Hugo Mundy, were ineffective. Specifically, in ground one, Petitioner claims counsel was ineffective at trial and on appeal in relation to the introduction of the black hat into evidence (because of the lack in the chain of custody) and the failure to have the hat tested for Petitioner's DNA. In ground two, Petitioner claims counsel was ineffective in failing to call an alibi witness.

To establish ineffective assistance of counsel, Petitioner must show that his counsel's performance was deficient and that the deficiency prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687 (1984); Evitts v. Lucey, 469 U.S. 387, 396 (1985). Petitioner must show that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the

6

Sixth Amendment, and that there is a reasonable probability that the lawyer's errors prejudiced the outcome of the proceedings against him. Strickland, 466 U.S. at 687; Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999).

A reasonable probability is one sufficient to undermine confidence in the outcome; it is a less demanding standard than "more likely than not." Strickland, 466 U.S. at 697. A court need not address both parts of the Strickland test if the Petitioner makes an insufficient showing on one. Id.

As indicated, Petitioner first claims counsel was ineffective in relation to the introduction of the black hat into evidence. In his Memorandum in support of his Motion, Petitioner raises the possibility that federal and state agents were in cahoots and that, together, they somehow planted the hat on Petitioner so as to make his conviction more likely. There is not a scintilla of evidence to support this theory and, contrary to Petitioner's assertion, counsel performed effectively in seeking to keep the black hat out of evidence.

After the jury was selected and before opening statements, counsel raised the issue as to the admissibility of the black hat. Specifically, the following arguments were made on behalf of Petitioner in an effort to keep the black hat out of evidence:

> MR. MUNDY: Your Honor, as I understand the Government's proof, Mr. Wehby [the Assistant United States Attorney] wants to say that this black hat was taken from an area in proximity to the firearm. We don't have any evidence that the hat was taken into evidence. It was never marked. It was never photographed at the scene. As far as we know, it was never placed into a plastic bag and put into an evidence locker. We simply cannot establish any chain of custody with this hat. To our knowledge, the first time the hat came into play was when a Federal ATF agent removed the hat from Mr. Drake's property. Up until that point, there's just simply no chain of custody established at all.
> MS. WOOTEN: May I have just a moment, please, Your Honor.
> (Discussion held off the record.)
> MR. MUNDY: Your Honor, Ms. Wooten raises an important point. On the Davidson County property record receipt of 3/4/2005, there's simply no indication that this hat came into property at the Metro jail. So, if I may, Your Honor.

7

>    (Document handed to the Court.)
>        MR. MUNDY: So it's our position that the Government simply cannot establish a chain of custody and this hat is simply not uniquely identifiable enough to be the hat, on its face. This could be any number of hats. And there's just not enough there to admit it into evidence.

(Crim. Case No. 3:05-00209, Docket Entry No. 65 at 19-20).

After counsel for the Government argued that the hat should in fact be admitted since any potential break in the chain of custody went to the weight and not the admissibility of the evidence, Petitioner's counsel argued:

>        MS. WOOTEN: May I respond, please, Your Honor. Very clearly, Your Honor, there was a black toboggan, kind of skullcap hat, found near the scene of the shotgun. I believe the testimony of the Government's witnesses will be that Mr. Avant took the hat into custody, picked up the hat. I believe that their witnesses would say that he secured the evidence of the firearm, but did not secure the evidence of any toboggan or hat. This would be on March 2nd of 2005. There is no mention in the Sheriff's report, when Mr. Drake was put into the jail, that a hat was even placed into his property.
>        On November 27, 2005, the ATF agents went and arrested Mr. Drake. And I believe it's their testimony that he had a hat on at that time. They cannot say, nor can Mr. Avant say, that the hat he had on at that time is the very same hat that the agents picked up on March 2nd, 2005, which was never placed into evidence or in any way secured.
>        As the courts have often said, when evidence is not readily identifiable and it's susceptible to alteration, tampering, or contamination, the trial courts require more stringent proof of the Government in terms of chain of custody.
>        We therefore ask the Court not to allow the Government to at this point try to link a hat that Mr. Drake had almost nine months later to a hat that was found at the scene, which allegedly was taken into custody or possession by Agent Avant.

(Id. at 22).

The Court reserved ruling on the admissibility of the hat pending the Government being able to lay a foundation for its introduction. The Government moved to introduce the hat during its examination of ATF Agent Mark Ridner, at which point counsel for Petitioner objected because there were no Marshals Service logs reflecting that the hat had been in Petitioner's presence when

he was taken into federal custody and because the inference which would be drawn by the jury if the hat were introduced was that the same black hat was found at the scene where the shotgun was discovered. Ultimately, the Court determined that the hat was admissible and it was introduced into evidence as Government's Exhibit 7.

During closing argument, counsel tried to convince the jury that the hat introduced into evidence was not the hat the Petitioner was allegedly wearing on the night of the incident. Counsel argued:

> I'll tell you what they've made much ado about. They said there was a black hat found next to the firearm. If it was important, they should have got it.
> This man was bleeding. Bleeding from his hand so bad that they wouldn't accept him in the jail. So if he's bleeding that desperately, that badly, wouldn't there be blood on the gun? Wouldn't there be blood on the hat?
> They told you about a black hat. Look at this hat. Did they tell you about a black hat that had FDNY on it, like Fire Department New York? Don't you think a law enforcement officer would have remembered this? No. The Government balls it up and puts it in a bag and does it like this so it doesn't matter.
> If he had had this hat on that night, don't you think someone would have noticed this?

(Crim. Case No. 3:05-00209, Docket Entry No. 67 at 24-25).

Given this record, counsel can hardly be said to have been ineffective in failing to keep the black hat out of evidence. Counsel set forth cogent reasons why they believed the hat should not be introduced, but the decision of whether the hat should be admitted was for the Court to make and the Court of Appeals found this Court's decision not to be an abuse of discretion. Drake, 280 Fed. Appx. at 454-455 (6th Cir. 2008). Further, when the hat was introduced over defense counsels' objections, counsel made every effort to convince the jury that the hat which was introduced was not the one the officers had seen on the night in question. Even on appeal, counsel argued that it was

9

improper for the Court to allow the introduction of the black hat into evidence and, in fact, it was a centerpiece of Petitioner's appeal. See, Drake, 280 Fed. Appx. at 454-55.

Petitioner also claims that counsel were ineffective because they did not seek DNA (deoxyribonucleic acid) testing on the hat. However, it was prudent for counsel not to have the hat tested for DNA because the only evidence was that Petitioner was wearing the hat when he was taken into federal custody and therefore his DNA would undoubtedly have been on the hat. See, Skinner v. Quarterman, 528 F.3d 336, 341 (5th Cir. 2008)(counsel was not ineffective in having evidence tested for DNA "because of the risk that such testing would reveal that the DNA was [defendant's] instead of . . . some other person's"). Moreover, if one were to buy into Petitioner's unsupported theory that the hat was "planted" on him, counsel's failure to have the hat tested for DNA was not ineffective because even if such testing showed Petitioner was not wearing the hat, this would not establish that Petitioner was not the individual chased from the Center and apprehended by the police on the night of March 2, 2005. See, LaFevers v. Gibson, 182 F.3d 705, 722 (10th Cir. 1999)(counsel was not ineffective in failing to have DNA testing conducted where such evidence, even if favorable, "would not make a difference in the case" because it would not "prove that he was not at the crime scene or that he was not involved" in the crime); see also, Pickney v. Dufrain, 59 Fed. Appx. 383, 387 (2nd Cir. 2003)(it was not ineffective of counsel to fail to introduce favorable DNA evidence where "the probative evidence would have been slight"); Smith v. Roe, 53 Fed. Appx. 851, 852 (9th Cir. 2003)("Although a negative result [from a DNA test] might have provided some minimal support to a defense that [defendant] was not present in the car at all, in light of the evidence at trial there is no 'reasonable probability' that the outcome would have been different").

10

Petitioner also claims that counsel was ineffective in failing to call an alibi witness. Petitioner does not identify who that alibi witness is, but claims that had the jury been able to hear from the witness, the jury would have reached "a completely different conclusion." (Docket Entry No. 1 at 3). Therefore, Petitioner argues, "[i]t was completely 'not a smart idea' for defense counsel to ignore . . . the relevance of a witness capable of exonerating Petitioner[.]" (Id. at 12).

This claim fails because Petitioner does not identify the alleged alibi witness or specify what his or her testimony would have been. See, Andersonv v. Collins, 18 F.3d 1208, 1221 (5th Cir. 1994); United States ex rel. Partee v. United States, 926 F.2d 694, 701 (7th Cir. 1991); Garner v. Quarterman, 2007 WL 1302399 at *4 (N.D. Tex. 2007). "A prisoner's bald conclusory assertion that supposed 'alibi' witnesses were not called does not serve to overcome the strong presumption that his counsel's actions were reasonable." Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001).

### IV. CONCLUSION

On the basis of the foregoing, Petitioner's "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by Person in Federal Custody" (Docket Entry No. 1) will be denied and this case will be dismissed with prejudice. No certificate of appealability will issue because Petitioner cannot demonstrate that reasonable jurists would find debatable or wrong this Court's conclusion that counsel was not ineffective or that any alleged ineffectiveness prejudiced the Petitioner. See Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

An appropriate Order will be entered.

*[signature]*

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE